**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DISH NETWORK, LLC and NAGRASTAR, LLC,**

                               **Plaintiffs,**

        **vs.**                                      **5:19-CV-1310**
                                                     **(MAD/ATB)**

**DEBRA HENDERSON; JOHN HENDERSON;**
**and BOOM MEDIA, LLC,**

                               **Defendants.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

**COUGHLIN, GERHART LAW FIRM**          **ROBERT R. JONES, ESQ.**
P.O. Box 2039
99 Corporate Drive
Binghamton, New York 13902-2039
Attorneys for Plaintiff

**HAGAN NOLL & BOYLE, LLC**             **TIMOTHY M. FRANK, ESQ.**
Two Memorial City Plaza
820 Gessner, Suite 940
Houston, Texas 77024
Attorneys for Plaintiff

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

In a complaint dated October 22, 2019, Plaintiffs allege violations of the Federal

Communications Act ("FCA"), 47 U.S.C. § 605, based on Defendants' alleged involvement in the

operation of illicit streaming services that capture Plaintiff DISH Network LLC's ("DISH")

satellite communications of television programming and then retransmit that DISH programming,

without authorization, to customers that purchased the equipment needed to access these services

from Defendants (the "Rebroadcasting Scheme"). _See_ Dkt. No. 1.  Defendants failed to answer

the complaint, despite being granted an extension of time to do so.  On December 27, 2019, Plaintiffs requested that the Clerk enter default against all named Defendants, which the Clerk entered that same day.  *See* Dkt. Nos. 18 & 19.

Currently before the Court is Plaintiffs' motion for default judgment.  *See* Dkt. No. 25.

## II. BACKGROUND

DISH is the fourth largest pay-television provider in the United States and delivers programming to millions of subscribers nationwide.  *See* Dkt. No. 1 at ¶¶ 1, 11.  DISH's subscribers have access to hundreds of television channels, including movies, sports programs, and general entertainment services ("DISH Programming").  *See id.* at ¶ 11.  DISH contracts for and purchases the right to broadcast DISH Programming from various rights holders.  *See id.*

Plaintiff NagraStar LLC ("NagraStar") provides conditional access security technology that authorizes the subscriber's receipt of DISH Programming.  *See id.* at ¶ 12.  DISH Programming is encrypted prior to being uplinked to satellites, and then retransmitted from the satellites to subscribers that (1) purchased from DISH the right to view such programming, and (2) have the equipment necessary to receive and decrypt DISH's satellite communications, including a DISH receiver and NagraStar smart card that convert DISH's encrypted satellite communications into viewable DISH Programming.  *See id.*

Defendants Debra Henderson and John Henderson are a mother and son team that operated the website previously accessible at https://boommedia.org ("Boommedia.org").  *See id.* at ¶¶ 5, 13, 18.  Mr Henderson conducted business under the name of Defendant Boom Media LLC, a company that he formed to carry out the Rebroadcasting Scheme and which operated under Mr. Henderson's dominion and control.  *See id.* at ¶¶ 6-7, 13, 18.  Mr. Henderson ran Boom Media LLC from his home and, based upon company records, he is the sole member and sole

official of the company. *See id.* at ¶ 7. Boommedia.org served as the face of the Rebroadcasting Scheme and the means by which Defendant — Debra and John Henderson, individually and through his alter ego Boom Media LLC — monetize their piracy. *See id.* at ¶¶ 7, 13-15, 17-18.

Defendants sold codes at Boommedia.org that enable customers to use their set-top box or other internet-enable device to access the streaming services known as MFG TV, Beast TV, Nitro TV, Murica Streams, Epic IPTV, Vader Streams, and OK2 (hereinafter, the "Device Codes" and "Services"). *See id.* at ¶ 13. Defendant touted the availability of sports programming, pay-per-view events, and adult content in describing the Services at Boommedia.org. *See id.* at ¶¶ 14-15. Defendant also advertised the availability of movie channels including HBO and Showtime, sports networks such as ESPN and Fox Sports, as well as UFC, WWE, and boxing pay-per-view events. *See id.* at ¶ 16.

Defendants sold Device Codes for approximately $10 to $20 per month of access to the Service selected by the customer. *See id.* at ¶ 17. Defendants also sold "loaded" or "programmed" set-top boxes for approximately $150, which are set-top boxes sold pre-configured with Device Codes. *See id.* Defendant Debra Henderson received payment for the Device Codes and set-top boxes sold from Boommedia.org, while Defendant John Henderson distributed the set-top boxes and Device Codes to those purchasers. *See id.* at ¶ 18.

According to the complaint, DISH Programming was rebroadcast without authorization to users of the Services. *See id.* at ¶¶ 13, 16. The DISH Programming retransmitted on the Services originated from DISH's satellite communications, as established by Plaintiffs' testing of the Services. *See id.* at ¶ 16. The analysis was conducted by inserting encoded messages into DISH's satellite communications and then viewing channels on the Services to detect the encoded

messages, thus confirming the DISH Programming originated from DISH's satellite communications.  *See id.*

Plaintiffs did not authorize the rebroadcasting of DISH Programming on the Services.  *See id.* at ¶ 13.  Defendants claim to control the programming offered on the Services, stating "[w]e reserve the right to control content" and "[w]e may add or remove channels at any time."  *Id.* at ¶ 19.  Additionally, Plaintiffs did not authorize Defendants to distribute Device Codes that enabled their customers to receive DISH Programming without paying a subscription fee to DISH.  *See id.* at ¶¶ 13, 22, 26.

## III. DISCUSSION

### A.    Default Judgment Standard

Rule 55 of the Federal Rules of Civil Procedure sets forth a two-step process for entry of a default judgment.  *See Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993).  First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case.  *See id.*; Fed R. Civ. P. 55(a) (providing that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default").  Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter a default judgment.  See Fed. R. Civ. P. 55(b).

The Second Circuit has cautioned that default judgment is an extreme remedy, and therefore should be entered only as a last resort.  *See Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981).  Although the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] ... delay and clog its

calendar," it has held that district courts must balance that interest with the responsibility to "[afford] litigants a reasonable chance to be heard." *Enron Oil Corp.*, 10 F.3d at 95-96.  Thus, in light of the "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored," and all doubts should be resolved in favor of the defaulting party. *Id.* Thus, a plaintiff is not entitled to a default judgment and any concomitant damages as a matter of right simply by virtue of a defendant's procedural default. *See Erwin DeMarino Trucking Co. v. Jackson*, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including: (1) whether the grounds for default are clearly established; (2) whether the claims were pleaded in the complaint, thereby placing defendants on notice of the relief sought, *see* Fed. R. Civ. P. 54(c) (providing that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); *Enron Oil Corp.*, 10 F.3d at 95-96; *cf. King v. STL Consulting, LLC*, No. 05 CV 2719, 2006 WL 3335115, *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated when a court awards damages that accrued during the pendency of a litigation, so long as the complaint provided notice that the plaintiff may seek such damages); and (3) the amount of money potentially involved — the more money involved, the less justification for entering default judgment. *See Hirsch v. Innovation Int'l, Inc.*, No. 91 CV 4130, 1992 WL 316143, *2 (S.D.N.Y. Oct. 19, 1992).  Additionally, "the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiff has been substantially prejudiced by the delay involved, and whether the default judgment may have a harsh effect on the defendant." *Pacific M. Int'l*

*Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 393 (S.D.N.Y. 2012) (internal citations omitted).

The plaintiff bears the burden of establishing their entitlement to recovery. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). Upon entry of default, the defendants are deemed to have admitted all well-pleaded factual allegations in the complaint pertaining to liability, but not legal conclusions or allegations relating to damages. *See id.*; *see also Advanced Capital Commercial Grp., Inc. v. Suarez*, No. 09 CV 5558, 2013 WL 5329254, *3 (E.D.N.Y. Sept. 20, 2013). It remains the plaintiff's burden to demonstrate that the uncontroverted facts establish each defendant's liability on each cause of action asserted. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). In determining whether the plaintiff has met that burden, however, the Court draws all "reasonable inferences from the evidence offered" in the plaintiff's favor. *Id.* (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

After demonstrating each defendant's liability, the plaintiff must also establish his or her entitlement to damages to a "reasonable certainty." *Gunawan v. Sushi Sake Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012). Although "the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing." *Fustok v. Conticommodity Servs., Inc.*, 122 F.R.D. 151, 156 (S.D.N.Y. 1988) (collecting cases), *aff'd*, 873 F.2d 38 (2d Cir. 1989).

**B.    Federal Communications Act**

*1. Section 605(a) Claim*

47 U.S.C. § 605 "generally prohibits the unauthorized use or publication of wire or radio communications." *Int'l Cablevision, Inc. v. Sykes*, 997 F.2d 998, 1007 (2d Cir. 1993) ("*Sykes I*").

6

As most recently recodified in connection with the Cable Communications Policy Act of 1984, Pub. L. 98-549, 98 Stat. 2997, Section 605(a) now states, in relevant part:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.
>
> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.
>
> No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.
>
> No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (line breaks between sentences added).  These four sentences are generally analyzed separately, as described below.

The first sentence of Section 605(a) was "intended to regulate the conduct of communications personnel ... rather than to address the problem of unauthorized interception or reception of communications," *Dish Network L.L.C. v. World Cable Inc.*, 893 F. Supp. 2d 452,

468-69 (E.D.N.Y. 2012) (quotation omitted), and therefore is not relevant here.  *See Int'l Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131 (2d Cir. 1996) ("*Sykes II*").

The second, third, and fourth sentences of Section 605(a) refer only to "radio" communications (rather than to communications "by wire or radio," as in the first sentence).  The term "radio communication," as used in the Communications Act, has long been understood to include satellite transmissions.  *See, e.g.*, *Sykes I*, 997 F.2d at 1008 (discussing the legislative history of the 1984 amendments to Communications Act).  Transmissions by coaxial cable, IPTV, or other means that do not involve "over the air" signals may be "wire" communications, but they are not "radio" communications.  *See, e.g.*, *Sykes II*, 75 F.3d at 130-31 (distinguishing between "cable-borne" and "over the air" transmission); *Joe Hand Promotions, Inc. v. Maupin*, No. 15-cv-6355, 2016 WL 6459631, *5 (E.D.N.Y. Oct. 31, 2016) (holding that "courts in the Second Circuit consider communication sent over the internet to be communication sent via wire"); *J & J Sports Prods., Inc. v. Jaschkowitz*, No. 5:14-cv-440, 2016 WL 8198768, *4 (E.D. Ky. July 11, 2016) (holding that "an Internet transmission qualifies as an interstate communication by wire" for purposes of Section 605(a)).

The second and fourth sentences of Section 605(a) "indisputably require an 'interception'" by their express terms.  *Dish Network*, 893 F. Supp. 2d at 471.  The term "intercept" or "interception," as used in Section 605(a), "means to stop, seize, or interrupt prior to arrival; or taking or seizing before arrival at the destined place."  *Premium Sports Inc. v. Connell*, No. 10 Civ. 3753, 2012 WL 691891, *2 (S.D.N.Y. Mar. 1, 2012) (citing *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967)).  Liability under the second and fourth sentences, therefore, requires pleading and proof that the transmission was intercepted.  *See id.* (dismissing claim under second and fourth sentences of Section 605(a) because "there must be an 'interception'

of a signal or a transmission").  The third sentence of Section 605(a) does not include the word "interception."  Instead, it prohibits "receiv[ing] or assist[ing] in receiving" radio communications by a person "not being entitled thereto ... for his own benefit or for the benefit of another not entitled thereto."

The party aggrieved of a violation of Section 605(a) is entitled to either actual damages or statutory damages for each violation of not less than $1,000, or more than $10,000, as the court considers just.  *See* 47 U.S.C. § 605(e)(3)(C)(i)(I)-(II).

### 2. Section 605(e)(4) Claim

Section 605(e)(4) provides, in pertinent part, that

> [a]ny person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned for not more than 5 years for each violation, or both.

47 U.S.C. § 605(e)(4).  Although § 605(e)(4) reads like a criminal statute, a private right of action exists for "any person aggrieved" by a violation.  *See* 47 U.S.C. § 605(e)(3)(A); *DirecTV, Inc. v. Mars*, No. 03-CV-73760, 2004 WL 1057752, *2 (E.D. Mich. Apr. 16, 2004); *see also Sykes I*, 997 F.2d at 1007.

Courts have held that this provision does not apply to non-manufacturers of equipment used in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services.  *See J&J Sports, Inc. v. Ferreiras*, No. No. 15-cv-6546, 2018 WL 6168557, *8 (E.D.N.Y. Nov. 20, 2018).  As the Ninth Circuit has explained:

> In contrast to subsection (a)'s targeting of individuals who use
> piracy devices to intercept satellite signals, subsection (e)(4) aims at
> bigger fish—the assemblers, manufacturers, and distributors of
> piracy devices.  The statute's two-tier damages provision treats each
> class quite differently, subjecting violators of subsection (e)(4) to
> significantly harsher penalties than those levied against violators of
> subsection (a).  *See* 47 U.S.C. § 605(e)(3)(C)(i)(II)....  The context
> of subsection (e)(4) and its penalties indicate that Congress intended
> that it apply to those who make piracy devices for commercial
> purposes rather than to end-users who employ piracy devices for
> individual personal use.

*DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854–55 (9th Cir. 2007).

The party aggrieved of a violation of Section 605(e)(4) is entitled to either actual damages

or statutory damages for each violation of not less than $10,000, or more than $100,000, as the

court considers just.  *See* 47 U.S.C. § 605(e)(3)(C)(i)(I)-(II).

### 3. *Application as to Liability*

In the present matter, the Court finds that the complaint plausibly alleges that Defendants

have violated Sections 605(a) and 605(e)(4).  Defendants violated Section 605(a) through their

operation of the Rebroadcasting Scheme.  Defendants retransmitted DISH Programming

originating from DISH's satellite communications to customers of the Services, or worked closely

with others to do so.  *See* Dkt. No. 1 at ¶¶ 13, 16, 19 (citing statements posted on Defendants'

website evidencing their control over the channels).  Defendants also sold the Device Codes

required to access DISH Programming on the Services.  *See id.* at ¶¶ 13, 17-18.  Defendants'

actions assisted their customers in receiving DISH Programming without authorization, which

benefitted Defendants in the form of Device Code revenues and benefitted their customers by

allowing them to avoid paying the required subscription fee to DISH.  *See id.* at ¶¶ 11-13, 17-18,

22.  As such, the complaint plausibly alleges that Defendants violated Section 605(a).

The complaint also plausibly alleges that Defendants violated Section 605(e)(4), which makes it unlawful to distribute "any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of ... direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a)."  The Device Codes, which Defendants sold individually and pre-loaded onto a set-top box, were designed and produced for purposes of allowing access to the servers that support the Services, and thus are a "device" or "equipment" for purposes of Section 605(e)(4).  Based on these allegations, the Court finds that Plaintiffs have plausibly alleged that Defendants distributed modified equipment that was used in the unauthorized decryption of satellite cable programming.  As such, Plaintiffs have established liability under Section 605(e)(4).  *See DirecTV, Inc. v. Meinhart*, 158 Fed. Appx. 309, 311-12 (2d Cir. 2005) (holding that a complaint alleging "the manufacture, assembly modification, sale, and distribution of devices designed primarily for the unauthorized decryption of DTV satellite transmissions" is sufficient to state a claim under Section 605(e)(4)); *see also Echostar Satellite LLC v. Rollins*, No. 5:07-cv-96, 2008 WL 314145 (S.D.W.Va. Feb. 4, 2008) (finding that the defendant was liable under Section 605(e)(4) where he posted encryption codes on the internet for others to gain access to satellite transmissions); *DISH Network LLC v. Lewis*, No. 4:19-cv-3125, 2020 WL 1862667, *2 (E.D. Mo. Apr. 14, 2020) (holding that the sale of passcodes meant to circumvent security measures enacted by the satellite provider falls squarely within the conduct prohibited by Section 605(e)(4)); *DISH Network L.L.C. v. Simmons*, No. 4:17-CV-53, 2018 WL 3647169, *5 (E.D. Tenn. June 28, 2018) ("Based on the volume of purchased IKS Server Passcodes, Simmons willfully violated the FCA because he knew or should have known that the codes were unlawful"), *report and recommendation adopted*, 2018 WL 3623764 (E.D. Tenn. July 30, 2018); *DISH*

*Network LLC v. Cintron*, No. 6:12-cv-640, 2013 WL 12385274, *2 (M.D. Fla. Jan. 25, 2013) (holding that the defendant violated Section 605(e)(4) through the unauthorized distribution of passcodes that permitted the purchasers to access, receive, intercept, and decrypt DISH Network programming).

Based on the foregoing, the Court grants Plaintiffs' motion for default judgment as to liability.

### 4. Damages

As set forth above, statutory damages for violations of Section 605(e)(4) may be awarded in an amount ranging from $10,000 to $100,000 for each violation.  *See* 47 U.S.C. § 605(e)(3)(C)(i)(II).  Statutory damages of $1,000 to $10,000 may be awarded for each violation of Section 605(a), subject to an increase of not more than $100,000 per violation if "the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain."  *Id.* § 605(e)(3)(C)(i)(II), (ii).  Such damages may be awarded without conducting a hearing if the affidavits and documentary evidence provide a sufficient basis for the damages requested.  *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).

In this case, Plaintiffs request statutory damages of $1,000 for each of Defendants' violations of Section 605(e)(4), which is significantly less than the $10,000 to $100,000 per violation range authorized by the statute.  *See* 47 U.S.C. § 605(e)(3)(C)(i)(II).  Plaintiffs contend that each "Device Code" distributed by Defendants constitutes a separate violation of Section 605(e)(4).  *See* Dkt. No. 25-2 at 11-12.  The Court agrees.  *See DISH Network LLC v. Cintron*, No. 6:12-cv-640, 2013 WL 12385274, *2 (M.D. Fla. Jan. 25, 2013) (awarding statutory damages of $3,160,000 under Section 605(e)(4), at $10,000 per violation, for the defendants' sale and distribution of 316 piracy devices); *DISH Network LLC v. Sonicview USA, Inc.*, No. 09-cv-1553,

2012 WL 1965279, *13 (S.D. Cal. May 31, 2012) ("Section 605(e)(4) is violated by each distribution of a piracy device").

As Plaintiffs note, due to Defendants' default and failure to participate in this case, Plaintiffs do not have the benefit of discovery identifying the exact number of Device Codes that Defendants sold.  *See* Dkt. No. 25-2 at 12.  Therefore, Plaintiffs have included statements made by Defendant John Henderson as evidence of at least some of the Device Code sales.  For example, Defendant John Henderson appears in several videos posted to Boom Media's YouTube channel, wherein he conducts Q&A sessions with customers regarding the Services.  *See* Dkt. No. 25-3 at ¶ 12.

A video titled "Call To Action ..." was added to Boom Media's YouTube Channel on June 3, 2019.  *See id.* at ¶ 14.  In this video, Defendant John Henderson states that a credit card processor Defendants used from February 2019 through early May 2019 refused to release $50,000 owed to Defendants for Device Codes that Defendants sold to customers.  *See id.*  As a form of retaliation, Defendant John Henderson urges his customers to initiate a charge back with their credit card issuer so that payments would be recouped from the credit card processor withholding the $50,000 from Defendants.  *See id.*  Mr. Henderson makes clear that the customers will keep the Device Codes purchased from Defendants, but instructs the customers to falsely inform their credit card issuers otherwise in order to effectuate the charge backs and get revenge on the credit card processor.  *See id.*

Defendants sold Device Codes for an average price of $15.00 for each month of service. *See* Dkt. No. 25-3 at ¶ 8; Dkt. No. 25-7 at ¶¶ 4-7, 9.  Accordingly, Defendant John Henderson's statement that Defendants were waiting for $50,000 in payments owed to them for Device Codes previously distributed to customers is evidence of 3,333 Device Codes sold by Defendants.  Given

that Plaintiffs "are entitled to all reasonable inferences from the evidence they presented" when seeking damages against a party in default, *see House v. Kent Worldwide Mach. Works, Inc.*, 359 Fed. Appx. 206, 207 (2d Cir. 2010), the Court finds that this number represents a fair approximation of the total number of Device Codes sold during this time frame (February through May of 2019). At $1,000 for each of the Device Codes, the Court finds that Plaintiffs are entitled to statutory damages of $3,333,000.00.

Even if the Court were to find that it is inappropriate to award damages below the statutory minimum amount of $10,000 for each violation of Section 605(e)(4) as requested by Plaintiffs, the Court would reach the same result. In addition to the Device Codes Defendants sold for approximately $15.00 for each month of service, Defendants sold pre-programmed set-top boxes for approximately $150. *See* Dkt. No. 25-7 at ¶ 8. Assuming that the $50,000 of funds withheld by the credit card processor represented money Defendants were supposed to receive for the sale of these pre-programmed set-top boxes, this would represent 333.3 units sold. Applying the $10,000 statutory minimum, the Court reaches the same statutory damages award of $3,333,000.

The Court finds that this award is justified for several reasons, including the fact that it is a rather conservative calculation of the Device Codes Plaintiffs sold. The number of Device Codes for which Plaintiffs seek statutory damages is based on payments received through only one payment processor during a limited time period of approximately three months from February 2019 to May 2019. Defendants accepted payment for Device Codes using at least eight additional payment processors, as well as virtual currency such as Bitcoin and Ethereum. *See* Dkt. No. 25-3 at ¶¶ 9-10; Dkt. No. 25-5 at ¶¶ 4-5, 8; Dkt. No. 25-7 at ¶¶ 4-9. Defendants also sold Device Codes both before and after this limited three-month period in 2019. According to Boommedia.org, Defendants were selling Device Codes as early as April 2017, and Defendants

14

continued offering Device Codes on their website through the time that this lawsuit was filed in October 2019, approximately thirty months later.  *See* Dkt. No. 25-3 at ¶ 11; Dkt. No. 25-5 at ¶¶ 4-8; Dkt. No. 25-9 at ¶¶ 6-7, 9.  As such, Plaintiffs' request for damages based on partial payment received by Defendants, during a three month period on only one of the many payment platforms, is a conservative request.

Additionally, as noted, Plaintiffs have requested an amount that is actually below the statutory minimum available for violations of Section 605(e)(4).  Plaintiffs have also not sought enhanced statutory damages, which would have been appropriately awarded given the willfulness of Defendants' conduct and flagrant disregard of the law.  In another video that Defendant John Henderson posted to the Boom Media YouTube Channel, he repeatedly reminds his customers that the products he is selling are "pirated streams," and that these items are no different than "buying f**king knockoff shoes. ...  It's black market shit. ..."  Dkt. No. 25-3 at ¶ 13.  Mr. Henderson explains that to purchase these services directly from the satellite and cable providers, the customers would receive "10% of the content and p[ay] four times the price."  *Id.*  Finally, Mr. Henderson informed his viewers that he received "a f**king phone call from Dish Network" and indicated that his position is as follows: "My stance is, f**k you sue me.  You want to f**king take me down you better bring me to court because I'm not just f**king rolling over, I never will, and even if that day happens I'm going to dump a f**king cup of water on my computer and f**king take whatever you can find."  *Id.*[1]

Finally, the Court notes that Plaintiffs are not seeking attorneys' fees and costs, which are available to an aggrieved party that prevails on a claim under Section 605(e)(4).  *See* 47 U.S.C. §

---

[1] According to Plaintiffs, this last statement was made in response to Defendants being informed by Plaintiffs prior to filing this suit that their Device Codes facilitated unauthorized access to DISH Programming.  *See* Dkt. No. 25-2 at 15.

605(e)(3)(B)(iii).  Accordingly, the Court finds that an award of $3,333,000 in statutory damages

is reasonable and justified in this case.  *See DISH Network LLC v. Cintron*, No. 6:12-cv-640, 2013

WL 12385274, *2 (M.D. Fla. Jan. 25, 2013) (awarding statutory damages of $3,160,000 under

Section 605(e)(4), at $10,000 per violation, for the defendants' sale and distribution of 316 piracy

devices); *Cablevision Systems Corp. v. Muneyyirci*, 876 F. Supp. 415, 425-26 (E.D.N.Y. 1994)

(awarding $3,900,000 in statutory damages for the defendant's sale of 390 devices in violation of

Section 605(e)(4)); *DISH Network LLC v. One Box TV, LLC*, No. 8:19-cv-2147, Dkt. No. 17

(M.D. Fla. 2019) (granting default judgment and awarding statutory damages of $3,800,000 for

violations of Section 605(e)(4), calculated based on the number of Device Codes reflected in

payment processor records subpoenaed with leave of court, multiplied by $1,000 for each code).

### 5. *Permanent Injunction*

Plaintiffs also request entry of a permanent injunction against Defendants for their

violations of Section 605(e)(4), pursuant to 47 U.S.C. § 605(e)(3)(B)(i).  *See* Dkt. No. 25-2 at 16.

The Court finds that Plaintiffs' request for a permanent injunction is appropriate.

The criteria for the issuance of a permanent injunction requires a plaintiff to demonstrate

the following: "(1) that it has suffered an irreparable injury; (2) that remedies available at law,

such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v.

MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As one court examining a similar matter concluded:

> The Court finds that based on the Defendant's conduct, Plaintiffs
> have suffered irreparable injury based on the piracy of their service.
> In addition, the damages provided for above, while significant, are

16

> inadequate to prevent future piracy without injunctive relief. The only hardship to Defendant from this injunction would be to prevent him from engaging in further illegal activity, so the balance clearly weighs in Plaintiffs' favor. The public interest is not disserved by an injunction as it will protect copyrights and help enforce federal law. The Court finds the criteria for a permanent injunction have been met and therefore orders Defendant be permanently enjoined from intercepting Plaintiffs' encrypted satellite communications or assisting anyone else in doing so.

*DISH Network L.L.C. v. DelVecchio*, 831 F. Supp. 2d 595, 602 (W.D.N.Y. 2011).

The equities here lead, inescapably, to the same conclusion. Accordingly, the Court grants Plaintiffs' request for a permanent injunction.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, Plaintiffs' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiffs' motion for default judgment (Dkt. No. 25) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment against Defendants, jointly and severally, in the amount of **$3,333,000** and close this case; and the Court further

**ORDERS** that Defendants, and any officer, agent, servant, employee, or other person acting in active concert or participation with any of them that receives actual notice of this order, are hereby **PERMANENTLY ENJOINED** from:

a.   Conducting the Rebroadcasting Scheme, or otherwise receiving or assisting others in receiving DISH's satellite communications or the television programming that comprises such communications without authorization from DISH; and

17

      b.      Selling or distributing Device Codes, or any other device or equipment that is intended for receiving or assisting other in receiving DISH's satellite communications or the television programming that comprises such communications without authorization from DISH; and the Court further

**ORDERS** that this Permanent Injunction takes effect immediately; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on Defendants in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: May 19, 2020
      Albany, New York

Mae A. D'Agostino
U.S. District Judge